# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-CA-00184-SCT

*JAMES JOSEPH WILLIAMS, INDIVIDUALLY; JETTIE WILLIAMS, INDIVIDUALLY; AND JETTIE WILLIAMS, CONSERVATOR OF THE ESTATE OF JAMES JOSEPH WILLIAMS*

*v.*

*LEE COUNTY SHERIFF'S DEPARTMENT; TERRY JONES, INDIVIDUALLY AND OFFICIALLY; DANNY DILLARD, INDIVIDUALLY AND OFFICIALLY; AND JOHN HALL, INDIVIDUALLY AND OFFICIALLY*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/06/1998 |
| TRIAL JUDGE: | HON. HARVEY S. BUCK |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN FORREST MARTIN |
| | KIM T. CHAZE |
| ATTORNEYS FOR APPELLEES: | WILLIAM M. BEASLEY |
| | GREGORY M. HUNSUCKER |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 07/29/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: 08/19/1999 | |

**BEFORE PRATHER, C.J., WALLER AND COBB, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. On January 26, 1995, three officers of the Lee County Sheriff's Department drove to James Joseph

Williams' residence and arrested him pursuant to information received from a detective of the Hollywood Homicide Division of the Los Angeles, California, Police Department. Detective McDonagh of the Hollywood Homicide Division informed Lieutenant Terry Jones of the Lee County Sheriff's Office that James Williams, for whom there was an outstanding warrant for murder in California, was thought to be in Lee County. McDonagh requested that Williams be apprehended and held. Subsequent investigation revealed that James Joseph Williams was not the man wanted in California, and he was released. Approximately a month after he was released, Williams suffered several strokes which he alleges are attributable to stress related to this incident and to the use of excessive force by Lee County Sheriff's deputies during the arrest. Williams and his mother filed a complaint on June 5, 1995, pursuant to 42 U.S.C. § 1983, alleging negligent and intentional violations of their constitutional rights. On January 6, 1998, the Circuit Court of Lee County, Mississippi, granted summary judgment to all defendants. Aggrieved, the Williamses appeal the order of that court and list the following issues:

**I. THE CIRCUIT COURT'S FINDINGS OF FACT WERE MANIFESTLY WRONG AND CLEARLY ERRONEOUS.**

**II. IT WAS REVERSIBLE ERROR FOR THE CIRCUIT COURT TO GRANT THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

### STATEMENT OF THE FACTS

¶2. On Thursday, January 26, 1995, Detective McDonagh of the Hollywood Homicide Division of the Los Angeles, California, Police Department spoke by telephone with Lieutenant Terry Jones of the Lee County Sheriff's Department and requested assistance in apprehending James Williams, Jr., for whom an arrest warrant for murder was outstanding in California, and who was believed to be in Lee County, Mississippi. He described Williams' physical appearance, gave his social security number, and informed Jones of two tattoos and one scar on Williams' body which would be useful in identifying Williams. Additionally, McDonagh gave Jones an address in Nettleton where Williams was thought to be. Deputy John Hall ran a National Crime Information Center ("NCIC") check on the social security/driver's license number provided by McDonagh and was able to confirm that the number corresponded to information received from McDonagh. Specifically, Hall confirmed that a driver's license for that number had been issued to James J. Williams, that Williams and the California suspect had similar physical characteristics, and that Williams lived in Nettleton.

¶3. Based on the information received from Detective McDonagh and on information gained from the NCIC search, deputies Jones, Hall and Danny Dillard of the Lee County Sheriff's Department drove to Williams' mother's home in Nettleton to arrest him. As they neared the residence, Deputy Hall realized that he had been there before. He informed his fellow officers that he had previously been called to the Williams home on a domestic disturbance call. On that occasion, when he and another deputy arrived, Williams had threatened his mother with a knife. Thus, Hall and the other deputies felt that Williams might be dangerous.

¶4. When they arrived at Williams' home, the deputies spoke with his mother, Jettie Williams, who was working in the front yard with her son, Tommy. Deputy Jones asked Mrs. Williams if "James Junior Williams" lived there. She responded that he did not, but that "James Joseph Williams" did live there. At that point, Jones directed the other deputies to proceed. The officers went into the house, and Jones entered Williams' bedroom and slapped and shook him until he woke up. All testimony, including that of his mother, indicated that this way of rousing Williams from sleep did not hurt him. Lieutenant Jones advised Williams to

put his shoes on because he was going with the officers. As Williams was exiting his bedroom, Jones shoved him toward the kitchen. Jones then handcuffed Williams and shoved him by the shoulder toward the door. According to Jettie Williams, once they were outside, Jones pushed or threw Williams into the back of the police car and then straightened him up in the seat. Mrs. Williams claimed that the thrust from the officer was so great that Williams hit his head on the door on the opposite side of the car. In Officer Jones' version of the events, he placed his hand on Williams' head to shield his head as he put Williams in the back seat of the car. The parties dispute whether the officers informed him that he was under arrest or told him why he was being detained. Los Angeles Police Department detectives arrived in Tupelo, Mississippi, on the day following Williams' arrest. They interviewed Mrs. Williams and James Williams in the Lee County Jail and concluded that Williams was not the man for whom they were looking. Williams was held in the custody of the Lee County Sheriff's Department until Saturday, January 28, 1995, at which point the Los Angeles police concluded that he was not their man and released him to his mother, Jettie Williams. Williams spent almost 48 hours in the Lee County jail. According to Jettie Williams, James Williams informed her on the way home from the jail that his head was hurting and that Officer Jones had slapped him in the head several times in an attempt to make him admit that he had been to California.

¶5. The parties have ascertained that the reason for the false identification of Williams was that while he was incarcerated in the Fulton, Mississippi, jail many years earlier, David Paul Gooch, a fellow inmate, stole Williams' driver's license. Gooch was the actual murderer, but had presented Williams' driver's license to the authorities in California when he was first arrested on the murder charge. It was due to Gooch's misrepresentation of his own identity and his subsequent flight from the State of California that California issued a warrant for the arrest of James Williams, Jr.

¶6. Williams suffered several strokes on or around February 25, 1995. He alleges that the strokes were the result of the arrest, detention, and excessive force used in making the arrest and during the detention. James Williams and Jettie Williams filed their complaint with the Lee County Circuit Court on June 5, 1995, naming as defendants the Lee County Sheriff's Department and Deputies Jones, Dillard, and Hall, both individually and officially. In the complaint, Williams alleged multiple deprivations of his constitutional rights and sought damages pursuant to 42 U.S.C. § 1983. Although the basis for her action is not specified in the complaint, Jettie Williams was also named as an individual plaintiff. She also sought damages under § 1983 for violations of her constitutional rights. Following the Appellees' answer, the Williamses filed an amended complaint on November 20, 1996, adding Jettie Williams, Williams' conservator, as a party.

¶7. The defendants subsequently filed a motion for summary judgment. The motion argued that the defendants were protected by sovereign immunity and that the plaintiffs had failed to demonstrate a policy or custom that had caused the alleged constitutional deprivations. The defendants relied on the deposition testimony of the parties and on various law enforcement documents in support of their motion. The motion was granted, and the cause of action was dismissed on January 6, 1998, after a hearing on the defendants' motion for summary judgment. The trial court found that the defendants were protected by sovereign immunity, that their actions had been objectively reasonable, and that there was no evidence of a Lee County policy or custom which had caused a constitutional deprivation. The Williamses appeal from the order granting summary judgment to all defendants.

## STANDARD OF REVIEW

¶8. The summary judgment motion is the only pretrial motion which allows the Court to "go behind the

pleadings" and consider evidence such as admissions, answers to interrogatories, depositions, and affidavits. If this examination indicates that there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law, summary judgment is appropriate. *Newell v. Hinton*, 556 So. 2d 1037, 1041-42 (Miss. 1990). In reaching this determination, the court examines affidavits and other evidence to determine whether or not a triable issue exists. Our purpose is not to resolve factual issues. While the motion for summary judgment is designed to expose "sham" claims and defenses, it should not be used to circumvent a trial on the merits where there are genuine issues of material fact. M.R.C.P. 56 cmt. We employ a *de novo* standard of review of the lower court's grant of a summary judgment motion. *Saucier v. Biloxi Reg'l Med.Ctr.,* 708 So. 2d 1351, 1354 (Miss. 1998) (*citing* **Townsend v. Estate of Gilbert**, 616 So. 2d 333, 335 (Miss.1993)). "The evidence must be viewed in the light most favorable to the . . . non-moving part[y] and [that party is] to be given the benefit of every reasonable doubt." *Id.* (*quoting* **Townsend**, 616 So. 2d at 335). Due to the public interest in protecting governmental officials and entities from the costs associated with defending civil lawsuits, summary judgment is especially applicable when governmental or official immunity is in issue. **McQueen v. Williams,** 587 So. 2d 918, 924 (Miss.1991).

## ANALYSIS

### I. WERE THE CIRCUIT COURT'S FINDINGS OF FACT MANIFESTLY WRONG OR CLEARLY ERRONEOUS?

¶9. In his first assignment of error Williams asserts that certain findings of fact made by the circuit court were manifestly wrong or clearly erroneous. Williams sets out eight specific objections to the circuit court's findings of fact. His objections are as follows: (1) Officer Jones was not advised in detail of the investigation and search for James Joseph Williams; (2) The California warrant was not faxed to Officer Jones on the day of the arrest; (3) The identification information provided Officer Jones did not match James Joseph Williams; (4) James Joseph Williams did not knowingly and voluntarily sign an extradition release; (5) The testimony of James Joseph Williams' family members recounting the facts of his arrest most certainly had something to do with this case; (6) James Joseph Williams was mistreated and hurt by the Defendants; (7) The Defendants did not have any authority to enter Mrs. Williams' home; and (8) A warrant for the arrest of James Joseph Williams was not issued in California. Williams argues that, based on the erroneous facts found by the Circuit Court, this Court should reverse the order of the circuit court granting summary judgment for the Appellees.

¶10. Because this Court reviews this entire matter *de novo,* including the factual background, we give no deference to the circuit court's findings of fact. Therefore, this issue is without merit. Relevant specific facts will be discussed more fully below.

### II. DID THE CIRCUIT COURT ERR IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT?

¶**11.** The Williamses brought this action under 42 U.S.C. § 1983, alleging various violations of their constitutional rights by Lee County officials. In order to prevail under § 1983, they must show that they have been deprived of constitutional rights by a person or persons acting under color of state law. *Conn v. Gabbert*, ___ U.S. ___, 119 S.Ct. 1292,1295, 143 L. Ed. 2d 399 (1999); **Barrett v. Miller**, 599 So. 2d 559, 563 (Miss. 1992). Given the benefit of doubt, the complaint alleges violations the plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights. The allegations can be summarized as claims for unreasonable arrest, unreasonable detention, excessive force, and invasion of privacy.

*A. Analysis of claims against Jones, Dillard, and Hall.*

¶12. Due to the threat that civil lawsuits against public officials will interfere with their ability to perform their duties, the Williamses can recover only if they are able to overcome the qualified immunity claims of the defendants. *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S. Ct. 2727, 2732, 73 L. Ed. 2d 396 (1982). The test for qualified immunity is twofold. First, the court must determine whether a public official's conduct deprived a § 1983 plaintiff of a "clearly established" constitutional or statutory right. *Wilson v. Layne*, 119 S. Ct. 1692, 1697 (1999). The constitutional right must be sufficiently clear to place a reasonable official on notice that certain conduct violates that right. *Id.* at 1699. Vague or general assertions of constitutional deprivations are not sufficient, and a § 1983 plaintiff must state with specificity the constitutional right he alleges has been violated. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S. Ct. 3034, 3038-39, 97 L. Ed. 2d 523 (1987). Second, qualified immunity protects a public official even if that official has violated a clearly established right if the official's conduct was objectively reasonable. *Wilson,* 119 S. Ct. at 1699. *See also* **Anderson v. Creighton,** 483 U.S. at 641, 107 S. Ct. at 3039-40, *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S. Ct. at 2738.

¶13. Williams' amended complaint generally charges that these officers unreasonably arrested him, illegally detained him, and used excessive force during the arrest and detention. These allegations, though generally unspecific, sufficiently allege deprivations of clearly established constitutional rights. *Sorenson v. Ferrie,* 134 F.3d 325 (5th Cir. 1998) (freedom from illegal arrest is a clearly established constitutional right); *Simmons v. McElveen,* 846 F.2d 337 (5th Cir. 1988) (illegal detention is a recognized § 1983 tort); *Petta v. Rivera,* 143 F.3d 895 (5th Cir.1998) (excessive force applied during an arrest can give rise to a § 1983 action). However, Williams' claims that he suffered unspecified due process, equal protection, and privacy rights violations are so vague and unspecific that they do not sufficiently allege violations of established constitutional rights. Williams provides no explanation or basis for these claimed violations. "[V]ague or general assertions of constitutional rights" will not suffice, and a §1983 plaintiff must "state with specificity the constitutional right that has been allegedly violated." *Sanchez v. Swyden,*139 F.3d 464, 466-67 (5th Cir. 1998). Because those allegations were not alleged with sufficient specificity, the trial court properly dismissed those claims.

¶14. The Williamses' amended complaint also includes allegations of intentional infliction of emotional distress and violations of the Mississippi Constitution in violation of § 1983. The Supreme Court has held that § 1983 is only available to remedy violations of the Constitution or of federal law. *Collins v. City of Harker Heights,* 503 U.S. 115, 119, 112 S. Ct. 1061,1065, 117 L. Ed. 2d 261 (1992). Section 1983 provides no remedy for these state law claims, and dismissal of those allegations was proper.

¶15. Deciding the merit of the remaining claims involves determining whether the actions of these sheriff's deputies amounted to a constitutional deprivation and whether the officers' actions were objectively reasonable. Because the analysis of those two questions is similar, they will be considered jointly.

*1. Illegal Arrest.*

¶16. The Sheriff's Office began its contact with Williams after Lieutenant Jones received a telephone call from Detective McDonagh of the Los Angeles Police Department. McDonagh informed the Jones that California had issued two warrants for the arrest of James Williams, Jr., who was suspected of murder. McDonagh stated that he had reason to believe that Williams was in Lee County and requested assistance

in arresting him. Later that morning, McDonagh faxed Jones a "warrant information sheet" which listed Williams' physical characteristics and stated that there was an outstanding felony homicide warrant for James Williams, Jr. From the suspect's social security number provided by McDonagh, Deputy Hall ran an NCIC check on Williams and was able to confirm that a James J. Williams lived in Nettleton and that his physical characteristics matched those of the California suspect. Based on that information, the officers arrested Williams.

¶17. Although California had issued two arrest warrants for James Williams, Jr., these officers did not actually have an arrest warrant in hand when they went to the Williams home in Nettleton. Williams claims that the arrest was illegal for that reason. This Court has held that law enforcement officers are not required to possess the warrant when they make an arrest. They are only required to have reliable knowledge of it. *Wilcher v. State,* 448 So. 2d 927, 932 (Miss. 1984) (arrest was legitimate when deputy knew that there was an outstanding warrant for the defendant at the sheriff's office even though the deputy did not have actual possession of the warrant). *See United States v. Munoz*, 150 F.3d 401, 411 n.6 (5th Cir.1998); *Washington v. Simpson,* 806 F.2d 192, 196 n.4 (8th Cir.1986); *United States v. Buckner,* 717 F.2d 297, 298-99, 301 (6th Cir.1983). *See also* Fed. Rule of Crim. Proc. 4(d)(3) ("The officer need not have the warrant at the time of the arrest but upon request shall show the warrant to the defendant as soon as possible"). These officers were entitled to rely on the California warrants. Actual possession of the warrants was not required to effect a legal arrest of Williams.

¶18. Williams claims that the fact that there were minor inconsistencies in some of the background information relied upon by the officers evidences the officers' lack of probable cause. Specifically, Williams notes differences between some of the physical characteristics listed in some of the police records, a variance in birth dates on some records, and a question about whether the identifiable tattoos and scar on the true suspect matched Williams. These differences are insignificant. This Court is aware that slight discrepancies are bound to occur in the voluminous paperwork generated by law enforcement agencies across the state and nation. Officers are equally aware of that fact. To hold that officers are required to release immediately a suspect who does not perfectly match the description provided in police paperwork would be ridiculous. A civil rights violation does not occur simply because the arrestee does not completely match the description of the suspect.

¶19. Williams also argues that the officers did not inform him of the arrest warrants while he was being arrested and did not tell him the reason for his arrest. Subject to some exceptions, Miss. Code Ann. § 99-3-7 requires an officer to inform an accused of the "object and cause of the arrest without a warrant." Williams claims that this omission makes his arrest illegal. This Court has held that the failure to inform a defendant of the object and cause of the arrest does not invalidate the arrest in certain incidences. *Upshaw v. State,* 350 So. 2d 1358, 1363 (Miss.1977). Failing to tell a defendant why he is being arrested simply shifts the burden of proving probable cause to the state. *Id.* Thus, assuming that the officers did not tell Williams why he was being arrested, the question becomes whether the officers had probable cause to arrest him.

¶20. Whether the officers had probable cause to arrest Williams depends on whether at the time of the arrest "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that Williams had already committed a crime. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S. Ct. 534, 537, 116 L. Ed. 2d 389 (1991) (*quoting Beck v. Ohio,* 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964)). This Court has held that

"probable cause exists when facts and circumstances within an officer's knowledge, or of which he has reasonable trustworthy information, are sufficient themselves to justify a man of average caution in the belief that a crime has been committed and that a particular person committed it." ***Bevill v. State,*** 556 So. 2d 699, 712 (Miss.1990). Additionally, Miss. Code Ann. § 99-3-7 (1994) specifically allows an officer to arrest a person without a warrant under the following circumstances:

> **§ 99-3-7. When arrests may be made without warrant.**
>
> (1) An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; **or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it**; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested. And in all cases of arrests without warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested on pursuit.

(Emphasis added.) The central issue is "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the officer possessed." ***Sorenson v. Ferrie,*** 134 F.3d at 328 (*quoting* ***Anderson v. Creighton,*** 483 U.S at 641, 107 S. Ct. at 3040).

¶21. The officers were entitled to rely on information they had received from California law enforcement authorities who informed them that a murder had been committed in California and that a person with James Williams' social security number and physical characteristics had committed it. ***Hamburg v. State,*** 248 So. 2d 430, 432 (Miss. 1971) (information provided to arresting officer by law enforcement source provide be sufficient probable cause to make an arrest). Additionally, they had reliable information as to the existence of actual arrest warrants for James Williams, Jr., which had been issued by a neutral and detached magistrate in California. Furthermore, the officers had been able to confirm much of the background information through an NCIC search of Williams social security number. At the time of the arrest, the officers had more than sufficient information to constitute probable cause that a crime had been committed, that Williams had committed it, and that his arrest was lawful. Williams' claim based on illegal arrest is without merit.

*2. Illegal Search.*

¶22. The Williamses claim that the actions of the Lee County deputies amounted to an illegal search of their residence. This is the only claim of Jettie Williams which was pled with sufficient specificity. The parties differ on whether Jettie gave the deputies permission to enter the house. The deputies claim that they requested and received permission to enter the home. Jettie denies that she gave them permission to go inside. However, she admits that she told the deputies that James Joseph Williams lived in the house when they asked her when they first arrived. Whether the deputies had permission to enter the residence is irrelevant. Williams was the subject of two arrest warrants. An arrest warrant "founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." ***Wilson v. Layne***, 119 S. Ct. at 1697 (*quoting* **Payton v. New York**, 445 U.S. 573, 602, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)). *See also* **Steagald v. United States**, 451 U.S. 204, 222, 101 S. Ct. 1642, 1652, 68 L. Ed. 2d 38 (1981) ("an arrest warrant alone will

suffice to enter a suspect's own residence to effect his arrest."). Because this was James Williams' residence and the deputies had warrants for his arrest, the deputies were entitled to enter the house with or without the permission of Jettie Williams. The plaintiffs' claims for illegal search are without merit.

### 3. Wrongful Detention.

*¶23.* The parties differ slightly on the length of Williams' detention in the Lee County jail. The Sheriff's Department arrest record states that Williams was arrested at 3:00 P.M. on January 26 and that he was released at 11:35 AM on January 28. Witnesses for Williams claim that he was arrested at approximately 1:30 PM and released at 1:00 PM two days later. The disputed three hours are not significant.

¶24. While the fact that an innocent man spent two days in jail is regrettable and even deplorable, it does not amount to a constitutional deprivation. The Supreme Court has held that "[t]he Constitution does not guarantee that only the guilty will be arrested, for "[i]f it did § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released." *Baker v. McCollan,* 443 U.S. 137, 145, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979).

¶25. The Fifth Circuit recently decided a similar mistaken identification case. In *Sanchez v. Swyden,* Oscar F. Sanchez was detained by U.S. Customs agents after his name and general description matched those of a fugitive wanted in Tennessee. *Sanchez,* 139 F.3d at 465. There is no indication in the opinion whether the Customs agents actually received a copy of the fugitive warrant from Cheatham County, Tennessee, or whether they simply relied on the other information they received from Cheatham County officials. After being held for approximately 26 hours, Sanchez was released when a comparison between his fingerprints and those of the fugitive from Tennessee did not match. *Id.* at 466. The Fifth Circuit held that detaining Sanchez for 26 hours, based on a facially-valid fugitive warrant from another jurisdiction did not deprive Sanchez of a clearly established constitutional right. *Id.* at 468-69.

¶26. The Fifth Circuit based its opinion in *Sanchez* in part on the U.S. Supreme Court's ruling in *Baker v. McCollan,* 443 U.S. 137, 99 S. Ct.2689, 61 L. Ed. 2d 433 (1979), in which the Supreme Court held that a three-day detention of an innocent man based on a facially valid arrest warrant did not amount to a constitutional violation. *Id.* In *Baker*, the innocent detainee was erroneously held on a warrant issued for his brother, who had used a duplicate of the detainee's driver's license and had posed as the detainee when facing a narcotics charges. *Id.*, 443 U.S. at 140-141, 99 S. Ct. at 2693. The Court held that the three-day detention did not constitute a deprivation of a clearly established constitutional right. *Id.*, 443 U.S. at 145, 99 S. Ct. at 2694.

¶27. Williams argues that the fact that he did not bear the identifying tattoos and scar of the true suspect warrants a finding of unlawful detention. McDonagh told Jones that the suspect had a rose tattoo on his inner left forearm, a star tattoo on the web area of his left hand, and a four-inch scar on his left wrist. Williams claims that the fact he was detained despite lacking those identifying marks amounts to a civil rights violation. The record reflects that the deputies did remove Williams' shirt during the arrest and did inspect him for tattoos. In her deposition, Jettie Williams, James' mother, testified that the deputies found a tattoo on Williams' body, but that it was a cross and not a rose. There was some confusion about whether the tattoos and scars matched the description given by McDonagh. But the fact that the deputies arguably might have determined at that point that Williams was not the man for whom they were looking is of no consequence. In *Sanchez,* the Customs agents received the true suspect's photographs and fingerprints shortly after Sanchez was detained. *Sanchez,* 139 F.3d at 465. The agents also had information that the

true fugitive had a tattoo of a rose on his shoulder. *Id.* Despite this information, the wrong man was held for 26 hours. The Fifth Circuit held that possession of exculpatory information does not expose a defendant to liability if the continued detention was due to mere negligence. *Id.* at 469. The Constitution does not require law enforcement officials "to conduct a virtually error-free investigation." *Id.* Williams has not shown that the failure to act on the exculpatory evidence amounted to anything more than simple negligence. Failing to release him based solely on potentially exculpatory information does not arise to an actionable deprivation of constitutional rights.

¶28. According to *Baker* and *Sanchez*, Williams' detention for approximately 48 hours, although distressing, does not amount to a constitutional deprivation.

### *4. Excessive Force.*

¶29. Williams' final claim is that the officers used excessive force during the arrest. Williams' witnesses state that Williams was asleep when the deputies arrived and that Jones slapped him while waking him up. Williams mother testified that the slapping did not hurt Williams in any way. In her deposition Mrs. Williams testified as follows:

Q. And he (Lieutenant Jones) went in there in the bedroom?

A. And he went to - -

Q. Woke him up?

A. That's right.

Q. He didn't hurt him, did he?

A. No, sir.

Q. He just kind of -

A. Woke him up.

Q. -woke him up a little bit and told him that he needed to get up and go with him?

A. Yeah.

Lamar Reeves, another witness for Williams, described the "slapping" as "just waking him up" and agreed that it was "like how your mama might wake you up in the morning." Clearly, this was not an "assault" as described in the complaint.

¶30. Williams also alleges that the deputies shoved him on several occasions. Williams claims that a deputy shoved him inside the house and again on the way to the car. Finally, Williams claims that he struck his head when a deputy thrust him into the car while he was handcuffed. Jettie Williams also testified that Williams claimed that Jones slapped him several times at the jail in an effort to get him to admit that he had been to California. The alleged slaps and shoves resulted in no marks, bruises, or any other noticeable injury. In order to prevail on an excessive force constitutional claim Williams must show (1) that the officers actions caused him an injury, and (2) that the actions were grossly disproportionate to the need for action under the

circumstances and were inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience. *Petta v. Rivera*, 143 F.3d at 902. It is important to note that, as a general rule, remedies under civil rights law are not nearly as broad as those available under state law. While a state law plaintiff is allowed to recover damages for any unwanted touching under the common law of battery, federal remedies under § 1983 are only available for more egregious conduct. *Burton v. Livingston*, 791 F.2d 97, 99 (8th Cir. 1986). The Supreme Court has noted that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," amounts to a constitutional deprivation. *Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989) (*quoting Johnson v. Glick,* 481 F.2d 1028,1033 (2d Cir. 1973) ).

¶31. To survive summary judgment, Williams first must show that he has suffered some injury. *Petta v. Rivera,* 143 F.3d at 902. While the alleged excessive force left no observable marks on Williams' body, he did present the affidavit of a doctor who stated that the treatment Williams received contributed to the strokes he suffered a month later. Williams submitted the affidavit of Dr. Sue Simmons who stated that she had been informed that Williams had been arrested and incarcerated and that he had been "abused" prior to and during the incarceration. She stated that stress from the arrest and incarceration increased Williams blood pressure and contributed to causing his stroke, and that blows to the head exacerbated his condition. Because we have found that Williams' arrest and detention were objectively reasonable, any stress resulting from the arrest and detention are not actionable under § 1983. However, Williams has presented sufficient evidence of a genuine issue of fact as to whether he suffered any injury as a result of the alleged excessive force.

¶32. Williams must also show that the officers' actions were grossly disproportionate to the need for action under the circumstances and were inspired by malice and were not caused by merely careless or unwise excess of zeal that amounts to an abuse of official power that shocks the conscience. *Id.* The circumstances in this matter do not reveal any evidence of malice on the part of the deputies. It is important to remember that the officers were dealing with a person they reasonably believed to be dangerous. He was wanted for murder in California, and one of the officers had previously witnessed Williams threaten his mother with a knife. Understandably, tensions run higher when the suspect is thought or known to be dangerous. While we do not condone the use of any amount of force against an arrestee which is not essential under the circumstances, the force allegedly used by these officers was not of the outrageous magnitude required to raise this conduct to the level of a civil rights violation for § 1983 purposes.

¶33. While the shoving and slapping may very well have been unnecessary, they were not of the egregious nature necessary to rise to the level of a constitutional deprivation. While Williams has demonstrated a factual issue as to whether the alleged excessive force resulted in any injury to him, he has completely failed to show that the force used by these officers was inspired by malice rather than simple unwise zeal. This issue is without merit.

B. *Analysis of claims against the Lee County Sheriff's Department and against the deputies in their official capacities.*

¶34. In addition to suing the deputies individually, Williams sued them in their official capacities, and he sued the Lee County Sheriff's Department. A governmental entity is only liable under § 1983 only for injuries caused by a municipal policy or custom. *Board of County Com's v. Brown,* 520 U.S. 397, 117 S. Ct.

[1382, 137 L. Ed. 2d 626 (1997)](). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." [*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978)](). *Accord*, ***Bankston v. Pass Road Tire Ctr., Inc.***, 611 So. 2d 998, 1009 (Miss. 1992). A § 1983 plaintiff must show a direct causal link between the municipal action and the deprivation of a civil right. ***Bryan County,*** 117 S. Ct. at 1389. There has been absolutely no showing of any official policy of Lee County which led to any constitutional deprivation. *See* ***Campbell v. City of San Antonio***, 43 F.3d 973, 977 (5th Cir. 1995) (single incident of arrest based on mistaken identity insufficient to show official policy). Summary judgment as to the Lee County Sheriff's Department and the officers in their official capacities was proper. This assignment of error is without merit.

## CONCLUSION

¶35. James Williams sufficiently stated constitutional deprivation claims only on his allegations of illegal arrest, illegal search, wrongful detention, and excessive force. Jettie Williams stated a claim with sufficient specificity only on the alleged illegal search. All other claims were properly dismissed as being too vague or general, or were otherwise not actionable under § 1983. Williams' claims for illegal arrest and wrongful detention fail because the actions of the officers were objectively reasonable under the circumstances. Both plaintiffs' claims for illegal search fail because the officers had search warrants and were entitled to enter James Williams residence pursuant to those warrants. Summary judgment was proper on the claim for excessive force because Williams has shown no evidence of malice or egregious conduct that would amount to a constitutional deprivation. Finally, the Williamses' claims against the Lee County Sheriff's Department and against the officers in their official capacities were properly dismissed because the Williamses have failed to show that the alleged injury was the result of any official policy or custom of the governmental entity. Therefore, summary judgment was appropriate as to all defendants on all claims.

¶36. The judgment of the Lee County Circuit Court is affirmed.

¶37. **AFFIRMED**.

**PRATHER, C.J., PITTMAN, P.J., BANKS, SMITH AND COBB, JJ., CONCUR. SULLIVAN, P.J., CONCURS IN RESULT ONLY. McRAE AND MILLS, JJ., NOT PARTICIPATING.**