# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-01013-SCT

*CITY OF JACKSON*

*v.*

*FREDERICK POWELL*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/4/2003 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BARBARA A. BLUNTSON |
| ATTORNEYS FOR APPELLEE: | CHOKWE LUMUMBA |
| | ALI MUHAMMAD SHAMSIDDEEN |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 11/10/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND RANDOLPH, JJ.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The City of Jackson appeals a judgment in favor of Frederick Powell, entered in the Hinds County Circuit Court.  Powell claimed that certain Jackson Police Department officers committed on him acts of assault and battery, intentional infliction of emotional distress, and negligence.   The case was tried without a jury, before Circuit Judge Winston L. Kidd, who found that: (1) the officers used excessive force; (2) Powell was not engaged in criminal activity at the time of the injury to him; and (3) the officers' actions were intentional and malicious.   Judge Kidd also found that the city was deliberately indifferent to citizens'

complaints, was negligent in the supervision of its officers, and approved the use of excessive force.

¶2.     Two separate orders were entered by the trial court on February 4, 2003.  In one, Judge Kidd found that Powell had proved his claim against all defendants and was entitled to $100,000 in compensatory damages from the City of Jackson and the two officers, jointly and severally.  He further found that the two officers were jointly and severally liable to Powell for an additional $50,000 in punitive damages.  Judge Kidd also further found that, pursuant to Miss. Code Ann. § 11-46-7(3) the city was responsible for all damage awards against the two officers.  Thus, judgment was entered against the city for $150,000.  In the second order, Judge Kidd cited 42 U.S.C. § 1988 (a), (b) and (c), and granted Powell $31,350 in attorney's fees and $3,300 in litigation costs, and again ordered that the City of Jackson was responsible for all costs, attorney's fees and money damages in the suit as a result of the action of the officers.

¶3.     After the judgment was entered, the City of Jackson filed a Motion for Judgment Notwithstanding the Verdict and/or an Alternative Motion for New Trial, which the trial court denied.  The city now appeals from the trial court's decision, asserting that the trial court erred by failing to find that Powell was engaged in criminal activity at the time of the injury and by finding that the officers used excessive force against Powell.  The city also asserted that if the trial court was correct in determining that the officers acted with malice, then the city was not liable for their actions. The city's final assertion of error was that the judgment of the lower court was against the overwhelming weight of the evidence.  We reverse and render.

**FACTS**

2

¶4.     Between the hours of 11:00 P.M. and 12:00 A.M. on March 16, 1995, Officers Donald McCluskey and Gil Baker noticed a car driven by Frederick Powell going the wrong way on a one-way street.[1]     The testimony reveals two totally different versions of what happened thereafter.     Powell initially attempted to drive away from the officers, claiming that he had only seen their headlights where they were parked, heading the wrong way, on the street he was entering.     He testified that he did not know the identity of his pursuers until the officers activated their blue lights.     Officer McCluskey, however, testified that the officers turned their blue lights on when they saw Powell turn the wrong way onto another one way street, well before they pulled him over.

¶5.     After coming to the end of a dead-end street, Powell stopped his vehicle, and the officers approached the vehicle and requested Powell's driver's license, which he did not have.     Powell testified that at this point, Officer Baker said "get out the car,   N-----."     Officer Baker placed Powell in the patrol vehicle without handcuffing him, while the officers ran the usual background check, which revealed that Powell's driver's license was suspended and that there was an outstanding warrant for his arrest on a simple assault charge.     As a result, the officers informed Powell that he was under arrest.     Officer McCluskey testified that he conducted an inventory search of Powell's vehicle incident to arrest and found ten small plastic bags of marijuana under the driver's seat.     Powell denies that he possessed marijuana and asserts that McCluskey planted the marijuana in the vehicle.     Powell testified that "when they come [sic]

---

[1]Both the officers are white,  and Powell is African-American.  The encounter occurred in precinct two in West Jackson, which is predominantly African-American.

up with the bag of marijuana that I didn't know I had no knowledge of, that's when I got frightened and scared." Powell further testified that he "just got frantic and started thinking about the Raymond jail facility where some people in the neighborhood were saying that they was [sic] beating young fellows up." He went on to explain that "people in the neighborhood was [sic] telling me about in Raymond that security guards down there was [sic] jumping on inmates and spraying mace in their face and beating them up for nothing, putting them in strap chairs. So by them telling me that and thinking that that's where I'm fixing to go, that's what really made me scared and made me escape the patrol car." Powell tried to escape by letting the electric window down and jumping out but he was not successful because his foot got caught in the window.

¶6. When McCluskey heard the window going down, he immediately yelled for Baker to assist him in stopping Powell. Officer McCluskey intercepted Powell as he was trying to remove his caught foot from the vehicle. Powell testified that McCluskey pushed him out of the window and started punching him in the back of the head, hitting him with a billy club, kicking him in the face, placing him in a choke hold, and calling him names. He further testified that Baker joined the fray, holding Powell's legs real tight to the ground. According to Powell, he was not armed and did not attempt to strike the officers.

¶7. The officers's testimony is decidedly different. Officer McCluskey, called as an adverse witness by Powell, testified that:

> I initially was going to just try and hold him [Powell] there against the vehicle. I told him to stop. I told him to get back in the vehicle. He ignored all that and continued trying to force his way out of the vehicle . . . Mr. Powell was very

4

aggressive in trying to escape.

McCluskey then attempted to force Powell to the ground in order to get Powell's hands behind his back to apply handcuffs. To accomplish this task, the officer used a progression of techniques that increased in physical force due to Powell's resistance and attempts to break away. These techniques eventually included McCluskey striking Powell twice in the face with punches, kneeing Powell in the face twice, placing Powell in a headlock, and Baker striking Powell with his foot several times in the arm. Both officers stated that they were not carrying night sticks or clubs and that they never kicked Powell in the face. Regarding Powell's actions and demeanor, McCluskey testified that during Powell's escape attempt and resistance, Powell physically assaulted him with his fists and came toward him in a threatening manner.

¶8. During the incident, Baker called for backup, and Officer Brian Pippen (who is African-American) arrived on the scene, after Powell was already on the ground. Pippen then handcuffed Powell. Pippen testified that Powell offered no resistance or struggle to being handcuffed. On the other hand, Powell testified that after handcuffing him, Pippen "stepped back about three steps" and kept watching while McCluskey and Baker continued to beat him. Powell further testified that he repeatedly "begged for help" from Pippen, saying "brother, are you going to let them do me like this?" McCluskey and Baker denied beating or striking Powell after Pippen handcuffed him and Pippen testified that he never saw McCluskey and Baker use physical force on Powell during the time he was at the scene.

¶9. Eventually, McCluskey and Baker placed Powell in the patrol car and took him to the precinct station. During this time, Powell claims that the officers continued to verbally

threaten him and said they were going to shoot him. Powell also testified that when they arrived at the precinct station, the officers continued to harass him and that McCluskey "rammed my head into the brick wall . . . and punched me in the face."

¶10. After Powell had been at the station for approximately 45 minutes, the officers took him to the hospital, where, Powell claims, he received a shot for pain and a shoulder x-ray. Powell's explanation for having said nothing to the doctors about the cause of his injuries, was that the officers threatened to continue beating him if he did.

¶11. Six witnesses were called by Powell to testify regarding the altercation between Powell and the officers. The first was Rosalind Hayes who had known Powell about a year at the time of the altercation, and that at the time she was 15 or 16 years of age. She stated that they were not close friends; that she sometimes saw him around the neighborhood. She testified that from the window of her house, which was located about "two houses down" from the altercation, she saw the officers pull Powell over. She told her sister and they "went outside onto the car porch, and stood out there." She testified that she saw Powell climb out of the patrol car window, get his foot caught, and fall to the ground hands first as the officers pulled him from the vehicle. Rosalind Hayes also stated that she saw Powell being beaten and kicked while on the ground and in handcuffs. Further, she did not see Powell offer any resistance to the officers.

¶12. The second witness was Cheryl Hayes, Rosalind's older sister, who had known Powell for about a year at the time of the altercation, but claimed that she was not close friends with him. Cheryl testified that she saw Powell climb out of the patrol car window and fall to the

ground. Cheryl Hayes then stated that she saw Powell being kicked and beaten with hands and sticks by the officers while on the ground. According to Cheryl Hayes, she did not see Powell offer resistance to the officers nor run from them.

¶13. The third witness was Kenyatta Green, who had known Powell about 13 years. She testified that the night of the altercation, she had been sitting on a friend's porch on the street where the police officers were patrolling, shining lights onto the porches in the neighborhood. She testified that she saw the officers go after Powell (after he had turned the wrong way onto a one way street) and that just before they "went after him" they had said "we're fixing to go get this MF." She further testified that she did not go all the way down to where the altercation occurred, but she did go part of the way. She could not see "actually what was happening down there." During Green's testimony, Powell's photo exhibits showing the relative locations of the streets, houses, pursuit and altercation were admitted. ¶14. The fourth witness was James Tirrell Roberts, an acquaintance of Powell, who testified that he had known Powell for three years prior to the incident. Roberts stated that his mother, uncle and cousin are all police officers. Roberts had been playing video games with his cousin at his grandmother's home, "heard a commotion" and ran down the street to see what was happening. He testified that the police were "jumping on Fred" and hitting him with a flashlight. Roberts arrived at the scene after Powell was handcuffed, and his testimony was that Powell did not attempt to hit or kick the officers. He also testified that when he had seen Powell earlier that day, Powell had teeth, but when he saw him "a day or two later", there were "about two or three of them missing."

¶15. The fifth witness was Donna Oliver who had known Powell for "maybe nine or ten

7

years." Oliver testified that she and her sister and two other friends walked down the street to where Powell was on the ground with his hands behind his back being beaten by the officers. Oliver also testified that she saw the officers beat Powell with either a flashlight or billy club, and that "his nose and mouth, all this area was bloody." According to Oliver, she did not see Powell hit, kick, or offer resistance to the officers.

¶16. The sixth witness was Catherine Russell, who testified that she had picked up a tooth and a jacket which she saw at the location where Powell was put into the patrol car. She did not see any of the physical altercation.

¶17. The first witness called by the defense was Officer Pippen, who arrived on the scene to assist, and helped put the cuffs on Powell. He directly contradicted all testimony put on by Powell regarding being beaten after he was handcuffed, and calling out for him (Pippen) to help him. He also did not recall seeing Powell bleeding from the mouth, and complaining about his shoulder. Further, he testified that he did not see any other civilians or other pedestrians in the area, but that he was on the scene only a matter of minutes. Powell was still on the ground when Pippen left, after helping to get Powell handcuffed.

¶18. Officer Baker also testified regarding the altercation, and described the tactics which they employed to subdue Powell sufficiently to get him cuffed. He denied that Powell was hit by anyone after he was cuffed. Baker further testified that he and McCluskey took Powell to the University Medical Center hospital for treatment and that he was present when Powell complained to the physician about his shoulder and his mouth. Baker also testified that Powell told the physician that the officers had not done anything wrong, and that he had been stupid in

8

trying to escape. On cross - examination, only two questions were asked.

¶19. Powell testified that his injuries included three lost teeth, as well as a bruised wrist, bruised jaw, bruised leg, shoulder pain, head pain, and knee pain. The city and the officers claimed that Powell's shoulder injury was a result of an old football injury and was not caused by the officers. Powell further claims that he suffered emotional trauma, bad dreams, and feelings of humiliation due to the actions of the officers and his subsequent appearance. In addition to his own testimony, the testimony of the six witnesses to the incident, and the testimony of the officers, Powell presented photographs of his injuries, a broken tooth picked up by Catherine Russell at the scene of the altercation, and a bloodstained shirt worn by Powell at the time of the incident. These were admitted as exhibits, most over the city's objections.[2]

¶20. Regarding Powell's missing teeth, Baker testified that before Powell's escape attempt he did not notice Powell missing any teeth or bleeding from the mouth. As previously discussed, four of Powell's witnesses testified that they saw him with a full set of teeth before the altercation and that after the incident Powell was missing teeth. In addition, one of them stated that she picked up a tooth she believed to be Powell's at the scene of the altercation.

---

[2]Although the city's designation of the record instructs that "all clerk papers, trial transcripts and exhibits be filed, taken or offered in this case including all testimony given before the trial court in this case" are to be included, no exhibits were sent to this Court. After many months of delay caused by the inability of the court reporter to complete the transcript, it finally was completed and the circuit clerk gave the customary notice to the attorneys of record that "the record is completed for appeal . . . and stating the 14/14 day time in which to review." Our Court's papers do not show that any exhibits were received, nor was anything filed by either party to say that the record was incomplete.

Dr. John Patterson, Powell's regular dentist, testified that before treating Powell for broken teeth on March 22, 1995, (six days after the altercation) he had not observed Powell to be missing any teeth and that the now missing teeth had been broken off at the roots. In order to repair Powell's mouth, Dr. Theodore Jones, an orthodontist, testified that Powell would need braces to reposition his teeth to their original position and dental implants to replace the broken teeth. In addition, Officers McCluskey and Baker testified that the sergeant at the precinct station asked what happened to Powell's teeth and that they let Powell rinse the blood out of his mouth.

¶21. The city and the officers argued that Powell did not produce any medical records that stated he had missing teeth on March 16, 1995. Powell countered by stating that he tried to obtain and never received medical records from University Medical Center, the hospital that treated him the night of the altercation. The city did question Powell briefly about the treatment, and amounts of the various medical bills, for his shoulder injury and his psychological problems. However, testimony regarding the lack of medical records was not pursued.

¶22. The city sought to make clear, on cross-examination of Dr. Patterson, that his evaluation of Powell simply indicated that Powell's injury occurred after March 17, 1995. Powell countered on re-direct with testimony from Dr. Patterson stating that he had no way of judging exactly a day or time of an injury and that persons who try to eat with such injuries continue to irritate the damaged areas.

¶23. After spending two days in jail, Powell was released on bond. He pled *guilty* to driving

the wrong way on a one-way street, driving with a suspended license, resisting arrest, assault on an officer, and destruction of government property. Powell pled *not guilty* to the charge of possession of marijuana, but was subsequently convicted. There is no mention in the record of the punishment received by Powell for the crimes to which he pled guilty. ¶24.

Powell filed complaints with the United States Commission on Civil Rights and with the Internal Affairs Division of the Jackson Police Department, but no results of these complaints are found in the record. During the trial, Officer McCluskey testified that he made seven appearances before Internal Affairs for complaints involving African-Americans between the time he joined the Jackson Police Department in November 1992, and the date of the present trial some ten years later.

¶25. The evidence presented at trial about the seven appearances that Officer McCluskey made before Internal Affairs was elicited from Officer McCluskey when called by Powell as an adverse witness. Other than Officer McCluskey's testimony, there was no evidence presented to indicate the substance of the seven appearances. The first appearance made by Officer McCluskey involved a teenage African-American male. Officer McCluskey was a part of a group of police officers that eventually totaled six involved in the arrest. During the arrest a gun and mace were found on the individual. In the process of removing the weapon from the individual Officer McCluskey struck him. Officer McCluskey did not receive notice of a violation, discipline or sensitivity training as a result of this incident.

¶26. The second incident involved an African-American male who received injuries to his knee and ear. Officer McCluskey arrested him after he attempted to flee from the police at

11

night. In the process of fleeing from the officers, the individual injured his knee running into a porch. The injury to his ear resulted from Officer McCluskey striking him with his weapon. Officer McCluskey testified that he struck the man because he had pulled a gun on him from his waistband. The injury to the ear was treated with stitches. After the individual was handcuffed Officer McCluskey attempted to escort him to the police car. As they were doing so, Officer McCluskey testified that the two of them fell to the ground because the individual continued to resist arrest. Officer Baker was also involved in this arrest. Officer Baker received an injury to his head which forced him to be treated by a doctor. The record does not state the cause of Officer Baker's injury. Officer McCluskey was not disciplined or given sensitivity training for this incident either.

¶27. The third incident involved the same teenage African-American male as previously mentioned and three other individuals. In this case the individual shot and hit Officer McCluskey with a shotgun. Officer McCluskey returned fire and shot eighteen rounds from his weapon at the four individuals. Officer McCluskey testified that all four individuals were shooting at him. The injuries from the shotgun wound were minor, and he was not hospitalized. He did miss work as a result of the incident for two weeks and then was placed on light duty for a month. As a result of this incident he received counseling from the police counselor at University Medical Center. However, this counseling did not include sensitivity training.

¶28. The fourth incident involved another shooting. Here Officer McCluskey and another officer fired rounds near a restaurant on New Year's Eve in 1995. This incident involved two

African-American individuals who exited the restaurant and fired on Officer McCluskey and a fellow officer. Officer McCluskey testified that the individuals, as they were fleeing, tried to run them over with their car. There was no evidence presented about the result of the Internal Affairs investigation, but Officer McCluskey did testify that he did not receive counseling after this incident.

¶29. The fifth incident involved Officer McCluskey firing rounds at an alleged robbery suspect. Officer McCluskey testified that this incident involved four African-American suspects. However, Officer McCluskey was the only officer who fired rounds. He fired seven rounds from his weapon which holds eighteen. There was no evidence presented as to the outcome of the Internal Affairs investigation or whether Officer McCluskey was disciplined or given sensitivity training.

¶30. The sixth incident involved a stop of two African-Americans. However, in this incident Officer McCluskey passed the two individuals to another officer. He was only called by Internal Affairs in response to the individuals' complaint against the other officer. ¶31. The seventh incident involved a DUI arrest of an African-American. In this incident the individual alleged that $250 went missing from his ice chest. This was the only incident that Internal Affairs found to be unsubstantiated. Officer McCluskey was never given diversity or sensitivity training, nor was he ever suspended for his actions or given treatment for post-traumatic stress syndrome.

¶32. The trial court found that Powell was entitled to $100,000 in compensatory damages from "the defendants City of Jackson, Baker, and McCluskey jointly and severally"; that

McCluskey and Baker were liable to Powell for $50,000 in punitive damages; and that he should be paid $34,650 for attorney's fees and litigation costs. Citing Miss. Code Ann. § 11-46-7(3), the trial court held the City of Jackson responsible for all awards against it and against McCluskey and Baker.[3]

¶33. Having thoroughly reviewed the record from the trial court and the applicable law which governs this case, we affirm the trial court's judgment in so far as it finds that the officers' actions went beyond the course and scope of their employment. We reverse and render the trial court's judgment finding the city liable for the officer's actions under the MTCA because the city is immune. Further, finding that § 1983 was not adequately pled in the complaint and that the record lacks evidence supporting the trial court's judgment, we reverse and render as to the award of attorney's fees and litigation costs.

## ANALYSIS

¶34. This Court's standard of review of a judgment from a bench trial is well settled. "A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor and his findings are safe on appeal where they are supported by

---

[3]Miss. Code Ann. § 11-46-7(3) states in pertinent part:

[E]very governmental entity shall be responsible for providing a defense to its employees and for the payment of any judgment in any civil action or the settlement of any claim against an employee for money damages arising out of any act or omission within the course and scope of his employment; . . . The provisions of this subsection shall not be construed to alter or relieve any such indemnitor or insurer of any legal obligation to such employee or to any governmental entity vicariously liable on account of or legally responsible for damages due to the allegedly wrongful error, omissions, conduct, act or deed of such employee.

14

substantial, credible, and reasonable evidence." *City of Jackson v. Perry*, 764 So.2d 373, 376 (Miss. 2000). This Court will not disturb those findings unless they are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *Id.* However, this Court reviews errors of law de novo, including the proper application of the Mississippi Tort Claims Act, Miss. Code Ann. §§ 11-46-1 et seq. [hereinafter MTCA]. *City of Jackson v. Brister*, 838 So.2d 274, 278 (Miss. 2003).[4]

> I. WHETHER THE TRIAL COURT ERRED BY FAILING TO FIND THAT THE CITY OF JACKSON AND OFFICERS McCLUSKEY AND BAKER WERE IMMUNE FROM LIABILITY UNDER MISS. CODE ANN. § 11-46-9(1)(c).

*Whether Powell was Contemporaneously Engaged in Criminal Activity.*

¶35. The city argues that the trial court committed reversible error by failing to find it immune from liability under § 11-46-9(1)(c) because Powell was contemporaneously engaged in criminal activity. Section 11-46-9 (1)(c) states:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
>
> (c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity *at the time*

[4]Insofar as the record reflects, no appeal has been perfected by or on behalf of Officers McCluskey and Baker. To be sure, it appears from the proceedings below that the city has been protecting the interest of the officers as required by Miss. Code Ann. §11-46-7(4). However, the record reflects that Officers Baker and McCluskey were separately and individually named and for all intents and purposes have been separate litigants in the proceedings below. Officers McCluskey and Baker have not perfected an appeal apparently because the judgment was against the city.

*of injury*.

Miss. Code Ann. § 11-46-9 (1)(c)(emphasis added). Judge Kidd found that Powell was not engaged in criminal activity at the time of his injuries because "evidence presented at trial showed that [Powell] offered no resistance after he was forced to the ground." The trial court further stated "the injury occurred after the commission of any alleged offense and after [Powell] was subdued and handcuffed." There was evidence to the contrary presented by the city and the officers.

¶36. The MTCA is the exclusive remedy for filing a lawsuit against governmental entities. Miss. Code Ann. § 11-46-7(1); *Brister*, 838 So.2d at 278. "Although the MTCA waives sovereign immunity for tort actions, it also prescribes exemptions from this statutory waiver under which a governmental entity retains its sovereign immunity." *Miss. Dep't of Pub. Safety v. Durn*, 861 So.2d 990, 994 (Miss. 2003). Immunity under the MTCA protects the city from lawsuits arising out of the performance of a police officer's duties in law enforcement with respect to the alleged victim. *Perry*, 764 So.2d at 379. However, the exemption is not designed to protect grossly negligent or intentional tortfeasors from liability where the fact that the victim is engaged in criminal activity has no relation to the transaction out of which liability arose. *Id.* In order to prove that a victim is engaged in criminal activity "it must be shown that the criminal activity has some causal nexus to the wrongdoing of the tortfeasor." *Id.*

¶37. The city argues that the present case is analogous to two cases where this Court held

16

a governmental entity immune from suit under § 11-46-9(1)(c): *Estate of Williams v. City of Jackson*, 844 So.2d 1161 (Miss. 2003), and *Bridges v. Pearl River Valley Water Supply Dist*., 793 So.2d 584 (Miss. 2001). In *Estate of Williams*, the estate of James Williams sued the City of Jackson after a municipal fire truck responding to an emergency collided with Williams's vehicle at an intersection. Williams's vehicle caught fire and he died at the scene. Evidence demonstrated that Williams failed to yield the right of way and tried to beat the fire truck across the intersection. In addition, toxicology reports revealed Williams's blood alcohol content was .20, which was twice the legal limit. *Williams*, 844 So.2d at 1163.

¶38.    In *Estate of Williams*, the City of Jackson claimed immunity pursuant to § 11-46-9(1)(c), arguing that Williams was engaged in criminal activity at the time of the accident. *Id.* at 1164-65. This Court held that "operating a vehicle involves both the moving and the stopping of a vehicle and when these are done under the influence of alcohol, it is considered criminal activity . . .." *Id.* at 1165. Additionally, this Court found that there was a causal nexus between Williams's criminal activity and the actions of the municipal employees. The Court stated that "had [Williams] not been driving while intoxicated, Williams would not have attempted to beat the fire truck through the intersection and would not have been killed." *Id.* Consequently, this Court held the City of Jackson was immune to suit.

¶39.    The city also cites *Bridges* in support of its contention that there is a causal nexus between Powell's criminal activity and the officer's actions. In *Bridges*, the plaintiff sued the Pearl River Valley Water Supply District, alleging that a security officer employed by the

17

District used excessive force in arresting Bridges. ***Bridges***, 793 So.2d at 586. This Court noted that Bridges was convicted of resisting arrest in the incident. ***Id.*** Furthermore, Bridges's injuries occurred while he was actively resisting arrest and being handcuffed.[5] It was Bridges's active resistence which exacerbated the amount of force that the officer applied in making the arrest, and that extra force is what caused the injury. ***Bridges v. Pearl River Valley Water Supply Dist.***, 878 So.2d 1013, 1015 (Miss. Ct. App. 2004). As a result, this Court held that "where an officer has probable cause to arrest and proceeds to do so, there is the requisite nexus between criminal activity and the action causing injury." ***Bridges,*** 793 So.2d at 588. Accordingly, this Court held that the Pearl River Valley Water Supply District was immune.

¶40. The city's reliance on ***Estate of Williams*** and ***Bridges*** is misplaced. In both cases, the plaintiffs' criminal activity [driving under the influence and resisting arrest] was a direct cause of their injuries. It is easy to distinguish ***Estate of Williams*** from the present facts, but ***Bridges*** is a closer call and requires explanation. In ***Bridges,*** the plaintiff was actively resisting arrest while force was being applied. ***Bridges,*** 878 So.2d at 1015. Bridges's resistence to the arrest was a direct cause of the escalation of the force used by the officer in

---

[5]More factual information is contained in the subsequent Court of Appeals opinion, ***Pearl River Valley Water Dist. v. Bridges***, 878 So.2d 1013, 1014-15 (Miss. Ct. App. 2004). This Court remanded ***Bridges*** to the trial court for a determination of whether the District was engaged in a policy-oriented decision-making process when supervising employees and whether the arresting officer acted with malice. The trial court on remand found that the District and the arresting officer were liable to Bridges. The Court of Appeals reversed the trial court, and this Court denied Bridges's petition for writ of certiorari, 878 So.2d 67 (Miss. 2004).

handcuffing him. *Id*. Further, Bridges's injuries were to his wrist, arms and shoulders and were directly related to the police officer placing his hands into the handcuffs. *Id.* However, Bridges's injuries occurred before and during the cuffing. There was no evidence that force continued to be applied by the officer after that time.

¶41. In the present case, there was widely contradictory evidence presented to the trial court. Powell and six witnesses testified that Powell's injuries occurred after the officers subdued and handcuffed him. It is undisputed that Powell violated several laws, including resisting arrest, but when the officers subdued and handcuffed Powell, his criminal activity had ceased. Powell's offenses that led to his arrest and subsequent escape attempt did not cause the officers to continue to beat and kick Powell after he had been subdued and handcuffed.

¶42. The statute granting conditional immunity to police officers is designed to protect law enforcement personnel from lawsuits arising out of the performance of their duties. *Perry*, 764 So.2d at 379. Physically abusing a person in custody is not one of the duties of law enforcement personnel. As the Court of Appeals has correctly held, immunity under § 11-46-9(1)(c) applies only to claims brought by individuals who are engaged in criminal activity *at the time of the injury*. *City of Jackson v. Calcote*, 910 So.2d 1103, 1111-12 (Miss. Ct. App. 2005). In that case the police arrested an individual and after subduing and handcuffing him, proceeded to beat him. *Id.* The Court of Appeals found that at the time of the injury the individual was not engaged in the commission of the crime but had earlier been engaged in criminal activity. *Id*. Therefore, it did not meet the requirements of § 11–46-9(1)(c). We

19

agree with this analysis and apply it to the present case. The crimes for which Powell was charged and convicted ceased prior to the delivery of the offensive blows by the officers. His attempt to resist arrest ended, at the latest under the facts of this case, when he was handcuffed. The trial court did not manifestly abuse its discretion in its finding.

¶43. If immunity is found in situations like this, there is risk that it might grant police officers *carte blanche* to use unnecessary force on arrested individuals, yet still seek shelter under immunity. To hold the city immune from suit for Powell's injuries would lead to the disturbing result of police having immunity for abusive actions against a person after being subdued and handcuffed. Therefore, the city is not immune from suit due to Powell's previous criminal activity and escape attempt. However, the analysis does not stop there.

*Whether the Officers' Actions were done in Reckless Disregard to Powell's Safety.*

¶44. The city also argues that it is immune from liability under § 11-46-9(1)(c) because the trial judge failed to make a finding that the officers acted in "reckless disregard" of Powell's safety and well-being at the time of his injury. In order to recover under the MTCA, a plaintiff must prove that the officer "acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(1)(c); *see* **City of Ellisville v. Richardson**, 2005 WL 976999, ¶¶ 13-21 (Miss. Apr. 28, 2005). "Reckless disregard" has been described by this Court as "a higher standard than gross negligence and 'embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'" **Collins v. Tallahatchie County**, 876 So. 2d 284, 287 (Miss. 2004)(quoting **Turner v. City of Ruleville**, 735 So.2d 226, 230 (Miss. 1999)).

20

¶45. The city's argument that it cannot be liable to Powell because the trial judge did not make a finding of "reckless disregard" is incorrect. In **Richardson**, the trial judge found only that the defendant officer acted *in disregard for the safety and well-being of others* but this Court nevertheless affirmed the trial court's judgment against the City of Ellisville. **Richardson**, 2005 WL 976999, ¶ 15. In the present case, the trial judge found the officers' conduct as "intentional and malicious" as well as "callous and willful." Since the trial judge also described the officers' conduct as "intentional" and "willful" in a portion of his opinion where he determined whether the city and the officers where immune to suit under § 11-46-9(1)(c), that is sufficient to show that the trial judge evaluated the evidence under the correct standard for "reckless disregard" as enunciated by this Court in **Collins.** Therefore, the city's argument that it is immune from liability to Powell under § 11-46-9(1)(c) is without merit.

## II. WHETHER THE TRIAL COURT ERRED BY FINDING THAT OFFICERS McCLUSKEY AND BAKER USED EXCESSIVE FORCE AGAINST POWELL IN ATTEMPTING TO PLACE HIM UNDER ARREST.

¶46. The city next argues that the trial court erred by finding that Officers McCluskey and Baker violated Powell's constitutional rights by using excessive force in arresting him. The officers continued to use force on Powell after he was subdued and handcuffed; as a result, their actions were grossly disproportionate and malicious. Therefore, the trial judge did not err.

¶47. This Court has held that the police may exert physical force in overcoming resistance during an arrest, but they may only use that force which is reasonably necessary to respond to the resistance encountered. **Webb v. Jackson,** 583 So.2d 946, 951 (Miss. 1991). *See also **Graham***

21

***v. Connor***, 490 U.S. 386, 396, 109 S.Ct. 1895, 1871-72, 104 L.Ed.2d 443 (1989) (Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" amounts to a constitutional violation. ***Graham***, 490 U.S. at 396. A plaintiff will prevail on an excessive force constitutional claim if they can show that:

> (1) that the officers actions caused [them] injury; and (2) that the actions were grossly disproportionate to the need for action under the circumstances and were inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience.

***Williams v. Lee County Sheriff's Dep't***, 744 So.2d 286, 297 (Miss. 1999). Therefore, this Court's determination of the nature of the officers' actions is judged on an objective standard with all the factors that they were confronted with, taking into account the fact that the officers must make split-second decisions. ***Graham***, 490 U.S. at 396-97.

¶48. In the present case, the actions of the police officers were malicious and beyond the degree of force necessary in the situation which they faced. Further, force was applied for a period of time after Powell was subdued and handcuffed when he was apparently offering no resistance at all. The officers were confronted with a situation where an arrested individual attempted to flee the scene of a nonviolent crime at night. They were aware of the fact that there was a warrant issued for him for simple assault, but there was no indication that he was violent or aggressive toward them. Once Powell's leg was freed from the window and he was forced to the ground the evidence is contradictory regarding whether Powell continued to resist arrest. The

22

trial court found that the blows dealt Powell by the officers were grossly disproportionate to the lack of resistence that Powell offered. *See generally*. ***United States v. Bigham***, 812 F.2d 943, 948 (5th Cir. 1987); ***Shillingford v. Holmes,*** 634 F.2d 263, 266 (5th Cir. 1981). As the trier of fact, the trial court weighed the evidence, including the credibility of the witnesses. We cannot say that in doing so he abused his discretion. The exercise of the degree of force necessary to knock out several teeth from the mouth of an individual who was handcuffed and unable to offer physical resistance to the police does shock the conscience and supports the trial court's finding of excessive force. We find no error in the trial court's decision as to this issue.

### III. WHETHER THE CITY OF JACKSON CAN BE HELD LIABLE FOR THE ACTIONS OF THE OFFICERS SINCE THE TRIAL COURT FOUND THEY ACTED WITH MALICE.

¶49. The city next argues that the trial court erred by holding it liable under the MTCA for the actions of Officers Baker and McCluskey despite the fact that the trial court found the officers' actions "malicious." Miss. Code Ann. § 11-46-5(2) states:

> For the purposes of this chapter *an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense* other than traffic violations.

(Emphasis added.) In addition, Miss. Code Ann. § 11-46-7(2) states:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties. *For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any*

23

> *conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.*

(Emphasis added). "These statutes unambiguously state that an employee can be found to be acting outside the course and scope of employment if acting with malice." *Bridges*, 793 So.2d at 590.

¶50.    It is undisputed by the parties that the officers were acting within the course and scope of their employment when they arrested Powell.    However, the trial court found the officers' later actions to be "malicious."    According to §§ 11-46-5(2) and 11-46-7(2), the State of Mississippi and its political subdivisions have not waived sovereign immunity for employees that act beyond the course and scope of their employment, and employees act beyond that scope when they act with malice.  *Bridges*, 793 So. 2d at 590.   Because Officers Baker and McCluskey acted with malice  the City of Jackson is immune from liability for their actions under the MTCA.

¶51.    It appears from the record that the trial court acknowledged that the officers acted with malice but still held the city liable because it negligently supervised the officers.   The trial court found that the City of Jackson was aware of Officer McCluskey's history of using excessive force and being abusive toward minorities.   Therefore, the trial court surmised that the city's liability was not premised on the actions of the officers but on its own actions.   This is an incorrect statement of the law.  A State may not be sued except by its consent. *Hall v. State,* 79 Miss. 38, 29 So. 994 (1901).   This State has abrogated parts of its sovereign immunity pursuant to the MTCA, but still retains immunity for various claims.  Miss. Code Ann. §§ 11-46-1, et seq.   For

24

its own actions the State and its political subdivisions have retained immunity for discretionary functions. *See Jones v. Miss. Dep't of Transp.*, 744 So.2d 256, 260 (Miss. 1999). Section 11-46-9 (1)(d) applies to this situation and reads:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
>
> (d) Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, *whether or not the discretion be abused;*

Miss. Code Ann. §11-46-9 (1)(d) (emphasis added). This Court has used a two-part test to determine if a function is discretionary: "(1) whether the activity involved an element of choice or judgment, and if so; (2) whether the choice or judgement in supervision involves social, economic or political policy alternatives." *Bridges,* 793 So.2d at 588 (citing *Jones*, 744 So.2d at 260). Conversely, conduct will be considered ministerial; and therefore, immunity will not apply, if the obligation is imposed by law leaving no room for judgment. *Doe v. State ex rel. Miss. Dep't of Corr.*, 859 So.2d 350, 356 (Miss. 2003) (citing *Leflore County v. Givens,* 754 So.2d 1223, 1226 (Miss. 2000)).

¶52.    As applied to this case the decision requires a determination of whether (1) the manner in which the City of Jackson chooses to supervise its officers involves an element of choice and; (2) whether the choice involves social, economic or political policy. *See Bridges,* 793 So.2d at 588. Miss. Code Ann. § 21-31-21, which deals with a police officer's tenure and grounds for discipline, contains a series of reasons for discipline but offers no automatic situations requiring discipline. Therefore, this statute requires the City of Jackson to exercise its judgment in the

25

manner in which it chooses to supervise its officers. *City of Jackson v. McLeod*, 199 Miss. 676, 686-88, 24 So.2d 319, 321 (1946). There is no doubt that the choice to employ and the manner of supervision of police officers does affects public policy, and the make-up of the police force inherently affects the social policy of a city. The manner in which a police department supervises, disciplines and regulates its police officers is a discretionary function of the government and thus the city is immune to suit under § 11-46-9(1)(d). Therefore, the judgment of the trial court regarding the city's liability to Powell pursuant to the MTCA is hereby reversed and rendered.

¶53. Pursuant to 42 U.S.C. § 1988 (a), (b) & (c), Judge Kidd awarded Powell attorney's fees and cost of litigation, totaling $34,650. While not implicitly stated in the judgment we must find that this award was based upon Powell's status as a prevailing party against the city in an action brought pursuant to 42 U.S.C. § 1983. There is no evidence in the record or proceedings below presented to this Court which indicates that § 1983 was a basis for the complaint or actually litigated at trial. Without a doubt the courts of this State have the authority to hear and adjudge a claim under § 1983. *Barrett v. Miller*, 599 So.2d 559, 564 (Miss. 1992). This authority is present even though the statute is not specifically cited by name in the complaint. *Hood v. Miss. Dep't of Wildlife Conservation*, 571 So.2d 263, 267 (Miss. 1990). This authority is stregthened by the duty and obligation our courts have to enforce federally created rights. *Burrell v. Miss. State Tax Comm'n*, 536 So.2d 848, 863 (Miss. 1988). However, in order for a trial court to have authority to decide a case under § 1983, it must be adequately pled in the complaint. *Garg v.*

26

*Albany Indus. Dev.  Agency*, 899 F. Supp. 961, 967 (N.D.N.Y. 1995)(citing **Barr v. Abrams**, 810 F.2d 358, 363 (2d Cir. 1987)),  *aff'd mem.* 104 F. 3d 351 (2d Cir. 1996).

¶54.    There are two essential elements of a § 1983 claim: (1) the conduct complained of was committed by a person acting under the color of state law; and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. **Barrett**, 599 So.2d at 563.  Powell's complaint does not specifically cite § 1983,  and nowhere in the pleadings is it mentioned.  However, Powell's complaint does allege that the officers acted "under the color of law" and that Powell suffered a violation of his constitutional rights.  We find that such conclusory language, unsupported by specific factual allegations is insufficient to state a § 1983 claim for inadequate supervision by the City of Jackson.  *See* **Garg,** 899 F. Supp. at 968.  The mere use of magic words in a complaint is not enough to put the city on notice that Powell claimed a § 1983 violation of his constitutional rights.  Further, the absence of factual support or evidence in the complaint makes this pleading insufficient on its face.  Litigants before the courts of this State cannot rely on ambiguous and conclusory assertions of error, but must provide clear and concise allegations of error in their complaints in order for the fair adjudication of claims.  *See* **Dowdell v. Fairman**, 21 F. Supp. 2d 828, 829 (N.D. Ill. 1998) (the complaint must at least set out facts sufficient to outline or adumbrate the basis of the claim).  We hold that Powell did not adequately plead § 1983 in his complaint;  and therefore,  the trial court's award of attorney's fees and litigation costs pursuant to § 1988 (a), (b) and (c) was inappropriate.  Therefore, as to the award of attorney's fees and litigation costs we reverse and render.

¶55. Assuming *arguendo*, which we do not, that Powell adequately pled § 1983, we would also reverse the award of the trial court because there was not a scintilla of evidence presented that the city was deliberately indifferent to the plight of African-Americans or that the city encouraged the type of actions which we find in the present case. A municipality will be responsible under § 1983 for failure to supervise and train its officers if that failure results in a violation of an individual's constitutional rights. *Callis v. Sellars*, 931 F. Supp. 504, 515 (S.D. Tex. 1996). The city must however be found to be deliberately indifferent to the rights of persons with whom the police officers come in contact. *Id*. There is no respondeat superior liability under § 1983. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691-92, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *East Miss. State Hosp. v. Callens*, 892 So. 2d 800, 817 (Miss. 2004). Therefore, the fact that the officers acted in a manner that **would** be deliberately indifferent to a person's rights does not necessitate the city's liability. *Love v. King*, 784 F.2d 708, 710 (5th Cir. 1986). The officers must have acted at the direction of the municipality or pursuant to a municipal policy or custom. *Monell,* 436 U. S. at 694; *Love,* 784 F.2d at 710.

¶56. There was not a scintilla of evidence presented to indicate that the city had either an on-the-books or off-the-books policy which encouraged the type of activity that the officers engaged in. Powell cited to the fact that Officer McCluskey was part of seven different Internal Affairs investigation for evidence that the city was on notice that one of its officers acted maliciously toward African-Americans and therefore the city, by not disciplining him or compelling him to engage in sensitivity training, was deliberately indifferent to the constitutional rights of African-

28

Americans. We find this unsupported by the facts presented at trial. Powell failed to call any witnesses or present any evidence which supported his allegations. The only witnesses that Powell did call were those present at the scene or the medical personnel who treated Powell afterwards.

¶57. The only evidence that was adequately presented at trial involved the night the incident took place. Other than the words of Officer McCluskey, testifying as to the substance of the seven occasions that he was called by Internal Affairs, there was no evidence presented to indicate the nature of his previous police activities. The fact that Officer McCluskey was called seven times by Internal Affairs does not provide a conclusion that the city encouraged the use of excessive force against African-Americans. Rather, the fact that Officer McCluskey was called by Internal Affairs seven times and never disciplined for his actions is suggestive of the conclusion that there was no wrongdoing on his part and that the city was actively involved in the supervision of its police officers. Therefore, we hold that the trial court's finding that the City of Jackson was deliberately indifferent to the rights of African-Americans was without factual support and therefore was clearly erroneous.

## IV. WHETHER THE JUDGMENT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶58. The city's final issue on appeal is whether the judgment of the trial court was against the overwhelming weight of the evidence. In essence, they use their fourth issue on appeal to reargue their first three issues. These issues have been adequately discussed *supra* and do not present any undiscussed reason or evidence demonstrating that the trial court should be reversed.

Therefore, the fourth issue raised on appeal is without merit.

## CONCLUSION

¶59.    The trial court did not err in finding that the actions of Officers Baker and McCluskey were malicious and willful.    Therefore they acted beyond the scope of their employment.    Thus, we reverse and render the trial court's judgment that the City of Jackson is liable to Frederick Powell, and hold that the city is immune under the MTCA.    We find that the trial court erred in awarding Powell attorney's fees and costs of litigation since 42 U.S.C. § 1983 was neither adequately pled nor proven by Powell.    Therefore, we reverse the trial court's award of attorney's fees and costs of litigation under 42 U.S.C. § 1988 (a), (b) & (c), and render judgment for the city denying Powell's motion for attorney's fees and costs of litigation.

¶60.    **REVERSED AND RENDERED.**

**SMITH, C.J.,   CARLSON AND DICKINSON, JJ., CONCUR. RANDOLPH, J., CONCURS IN RESULT ONLY.  DICKINSON, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., CARLSON AND RANDOLPH, JJ.  EASLEY, J., CONCURS  IN RESULT  WITH SEPARATE WRITTEN OPINION. WALLER, P.J., DIAZ AND GRAVES, JJ.,  NOT PARTICIPATING.**

**DICKINSON, JUSTICE, CONCURRING:**

¶61.    I write only to address Justice Easley's interesting opinion which almost convinces me. The trial court – which had the sole authority to determine the facts – concluded that the officers severely beat Powell after he was handcuffed, subdued, and was no threat to the officers.  Despite Powell's criminal conduct, commission of several crimes, attempted escape, and guilty plea,

neither Powell nor any accused, should be subjected to severe physical beating after they are handcuffed, subdued, and present no physical threat to the arresting officers. For this Court to decide this case differently would require that either we condone such conduct or ignore the trial court's findings of fact, and I am unable to do either. For these reasons, I cannot join Justice Easley's opinion, and I fully concur with the majority.

**SMITH, C.J., CARLSON AND RANDOLPH, JJ., JOIN THIS OPINION.**

**EASLEY, JUSTICE, CONCURRING IN RESULT:**

¶62. In my view, the majority errs in finding that Powell was not engaged in criminal activity and that the officers acted in reckless disregard for Powell's safety. Therefore, I must respectfully concur in result. While the majority finds that the City of Jackson is immune from liability, I find that the City of Jackson is immune but for other reasons than provided by the majority.

¶63. Powell was stopped by Officers McCluskey and Baker between 11p.m. and 12 a.m. for driving the wrong way on a one-way street. The officers turned on their blue lights and pursued Powell until he came to the street's dead-end. Powell had a suspended driver's license and **an outstanding warrant for his arrest on an assault charge**. When the officers searched the vehicle incident to the arrest, **ten plastic bags containing marijuana** were discovered in the vehicle. Powell testified that he panicked at the thought of going to jail. **He tried to escape out the patrol car's window**. That is when Powell claims the officers began beating him. Powell also alleges that the officer continued to verbally threaten him on the way to the precinct station

31

and rammed his head into a wall. McCluskey and Baker denied beating Powell after he was handcuffed. Another officer on the scene, Officer Pippen, also testified that he never saw McCluskey or Baker use physical force.

¶64. After spending two days in jail, Powell was able to be released on bond. Powell **pled guilty** to driving the wrong way on a one-way-street, driving with a suspended driver's license, **resisting arresting, assault on an officer, and destruction of government property**. Powell pled not guilty, stood trial, and was convicted for the possession of marijuana.

¶65. The Mississippi Tort Claims Act  is the exclusive civil remedy against a governmental entity or its employee for tortious acts or omissions which give rise to a suit. Miss. Code Ann. § 11-46-7(1); *City of Tupelo v. Martin*, 747 So.2d 822, 826 (Miss. 1999); *Pickens v. Donaldson*, 748 So.2d 684, 687 (Miss. 1999).

¶66. Miss. Code Ann. § 11-46-9(1)(c) provides immunity for governmental entities and employees acting within the course and scope of their employment duties. Police officers have conditional immunity under the MTCA from lawsuits arising out of their duties as law enforcement officers. *Perry*, 764 So.2d at 379. In order to recover under the MTCA, it must be proven that the police officer "acted in reckless disregard of the safety and well-being of any person **not engaged in criminal activity at the time of the injury**." Miss. Code Ann. § 11-46-9(1)(c) (emphasis added). However, the statute does not specifically define the term "reckless disregard," but  this Court has held the following:

Since "reckless disregard" is not defined by statute, Maldonado directs this Court's

32

attention to the various sources we have used in the past to define recklessness. This Court examined this issue in *Turner v. City of Ruleville*, and the Court looked to *Black's Law Dictionary* for guidance as to the proper definition:

> 'Reckless disregard of the rights of others' is defined [a]s used in automobile guest law, means the voluntary doing by motorist of an improper or wrongful act, or with knowledge of existing conditions, the voluntary refraining from doing a proper or prudent act when such an act or failure to act evinces an entire abandonment of any care, and heedless indifference to results which may follow and the reckless taking of chance of accident happening without intent that any occur....

735 So.2d 226, 228-29 (Miss.1999) (quoting *Black's Law Dictionary* 1270 (6th ed. 1991)). Additionally, this issue was also revisited in *Maye v. Pearl River County*, where we cited a definition of recklessness given by the Fifth Circuit:

> The terms 'willful,' 'wanton,' and 'reckless' have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do [sic] terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow.

758 So.2d 391, 394 (Miss.1999)(quoting *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 224 n.3 (5th Cir.1991) (emphasis in original)). Additionally, this Court has held that 'wantonness is a failure or refusal to exercise any care, while negligence is a failure to exercise due care." *Turner*, 735 So.2d at 229 (citing *Beta Beta Chapter v. May*, 611 So.2d 889, 895 (Miss.1992)) (quoting *Covington v. Carley*, 197 Miss. 535, 541-42, 19 So.2d 817, 818 (1944)).

*Maldonado v. Kelly*, 768 So.2d 906, 909-10 (Miss. 2000). In *Collins v. Tallahatchie County*,

33

876 So.2d 284, 287 (Miss. 2004), this Court recently defined reckless disregard as embracing "'willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'" (quoting *Turner*, 735 So.2d at 230).

¶67. The majority argues that Powell was handcuffed at the time of his injuries, therefore, the police waived immunity from the injuries that Powell suffered pursuant to the MTCA. However, it is clear that Powell pled guilty to resisting arrest, assault on a police officer, and destruction of government property. **The facts are also clear and Powell himself admitted that he attempted to escape from the officers because he panicked at the thought of going to jail. Powell was not handcuffed in the police car when he attempted to escape.** ¶68. While I do not condone the unbridled use of brutal force on individuals, the facts here do not prove that the officers involved acted in reckless disregard as to waive the City's immunity or that Powell was not engaged in criminal activity at the time. Furthermore, the majority's analysis is inconsistent in stating that Powell attempted to flee from a non-violent crime at night. Powell had an outstanding warrant for assault; Powell also pled guilty to assault on an officer and destruction of government property. Therefore, I find that the City is immune pursuant to Miss. Code Ann. § 11-46-9(1)(c).